And we'll turn to the next case on the calendar, which is United States v. Edward Smith. Thank you, Mr. Larson. Let's go. Good morning, Your Honors. Matt Larson of the Federal Defenders for Mr. Smith. Your Honors, as set out in our 28J letter, we believe that the Jones case controls the sentencing questionnaire, and that the case has to be sent back for resentencing, unless... Are you aware that the mandate is not issued in Jones? I am aware of that, Your Honor. Does that have any effect on your argument, or on what we should do? It does not, Your Honor. The operative document here is the judgment, the opinion which issued. That's the rule. The opinion is not the judgment. Or perhaps it is. Maybe you can help us on that. It's our view, Your Honor, that the Court's opinion is the judgment. The mandate merely gives effect to the judgment with respect to the particular appellant. But once an opinion is issued by the Court, it's precedent. And in fact, the Government has conceded this issue in a number of cases in district court since Jones was decided. So our position would be that Jones controls the sentencing question, and unless the Court has questions about that, I'll turn to the sufficiency issue. Go ahead. All right. Your Honors, the Government makes two arguments as to how bloodless baggies could have been pried from Mr. Smith's bleeding hands. Neither argument stands up to scrutiny. First, the Government says there must have been a larger plastic bag that contained the smaller baggies, and that's why there was no blood on the baggies. The blood was on the larger bag. Your Honors, if there had been a larger bag, it would have been produced. The police and the prosecution were meticulous in this case about producing every single piece of physical evidence that they secured, including evidence that was not necessary to conviction, such as the bloody jersey and such as the individual 14 baggies. For the drug charge, all they had to produce was drugs to show that it was, in fact, a controlled substance. The police were meticulous in presenting every piece of evidence. It taxes credulity, to quote the Clark decision, to say that the police had a larger bag bearing Mr. Smith's blood that tied him conclusively to the drugs that they simply opted not to present. Now, the Government has nothing to say to this argument, as it didn't in the trial court and it doesn't here. It simply taxes credulity to say that this smoking gun existed and yet was not produced. Review for sufficiency is, of course, deferential, but we are limited to the evidence and to reasonable inferences. It is not reasonable, Your Honors, to assume that there was this smoking gun piece of evidence that simply was not proffered. The second argument the Government makes is that, well, forget about the bag. Perhaps Mr. Smith's hands spontaneously stopped bleeding at the precise moment that this struggle ensued. Again, Your Honors, this is not a reasonable view of the record. There is no evidence to support the view that Mr. Smith's hands had stopped bleeding. The evidence is consistent that Mr. Smith's hands were bleeding at the scene, in the car, and at the precinct. Moreover, even assuming the Government's evidence-less speculation that the wounds suddenly closed at this precise moment, the Government has nothing to say to the point that if, in fact, a struggle ensued, as the claim was, over tightly clenched hands and officers trying to pry them open, that struggle would have produced some trace of blood. The jury in this case, Your Honors, drew a big red circle around the glaring hole in the Government's case. We're having trouble understanding why there's no blood on the baggies. The question is whether the jur- Now, they had this question, and though they convicted him, this Court has made clear, although the jury is the finder of fact, they are not entitled to convict based on confusion or speculation. There has to be record evidence supporting a rational finding beyond all reasonable doubt that the defendant is guilty. Here, the question is whether- I think there was testimony that the 14 bags of Coke, or whatever it was, were in a larger bag. Two of the officers made each a fleeting reference to a larger bag. However, the principal officer who took Mr. Smith into the holding area, Officer Moysa, gave very detailed testimony claiming that there were these loose baggies that fell one by one from, allegedly, from Mr. Smith's grip when it was pried open. Now, the Government- The jury's province to decide which of these officers, they think, got the story right? Credibility findings are absolutely generally for the jury, Your Honor, but this Court has recognized that such credibility findings are subject to review where they are inherently improbable or contradicted by the other evidence in the case. It's inherently improbable, we submit, that bloodless baggies would be pulled from bleeding hands. The Government doesn't dispute that. The Government says, well, there may have- maybe his hands spontaneously stopped bleeding, or maybe there was this larger bag, but again, if there was a larger bag, and again, the Government's silence is deafening on this point, it would have been produced. That is the only reasonable reading of the record, because the record shows that the police were not sloppy in terms of just not presenting key evidence, and, in fact, this would have been the key evidence to tie Mr. Smith to the drugs. It was not produced. The question, Your Honors, is ultimately whether the jury reasonably credited the claim of these officers prying crack from Smith's hands, and the answer is no. If there was a larger bag, it would have been produced, and if there was no larger bag, there would have been traces of blood on these small baggies. It is thus reasonably possible that this claim is not true, and where there is such a reasonable possibility of innocence, even after drawing the reasonable inferences in the Government's favor, reversal for insufficiency is warranted. If there are no further questions, I'll reserve the balance of my time for rebuttal. Thank you, Mr. Larson. Good morning. May it please the Court, my name is Daniel Tracer, and I represented the United States at trial and on this appeal. The evidence at trial was more than sufficient for the jury to find the defendant's guilt beyond a reasonable doubt, and while we do concede that in light of this Court's decision in United States v. Jones, the defendant's robbery should not be considered a crime of violence for guidelines purposes, Judge Vela gave great consideration to the personalized sentence here, and we believe that no remand is necessary because this Court should have no reasonable probability to find that Judge Vela would have done anything different. What's your view on the mandate question, if it is a question? I think that this Court has the ability and it would be prudential for this Court to not issue a decision in this case until the mandate does issue in Jones. While I agree with Mr. Larson's characterization of how the mandate works, I think that the mandate has stayed pending beckles, which we expect will be argued shortly and may be decided over the course of this next term, which would affirmatively tell us how Johnson applies or whether Johnson applies to the guidelines. Did the Jones panel explicitly say that they were holding the mandate? I'm not... Yes, they did. Isn't that what you just said? You suggested that they were? Yes. I may have misunderstood what you said. Do we know what the panel in the Jones case decided to do about its mandate? They stayed the mandate in that case. For rehearing or for beckles? I believe pending beckles. So that leaves that whatever question there is lurking in Jones open for some months now. Correct. Correct. And in addition, I would add that there's no prejudice to the defendant for this Court holding a decision here. Even under the amended guidelines, these sort of post-Jones guidelines, he'd be looking at a low end of 84 months. We don't think, and I'll address this in a minute, that Judge Phaler would have done anything different anyway. Even if this Court concludes that she might have, I think that the 84 month sentence, if this Court were to wait another six months or a year, would not prejudice the defendant. In terms of the sufficiency of the evidence, the jury was told by the officers in this case that it was a high drug area. There were three police officers that testified that they saw the drugs that were recovered from Mr. Smith's hands. And in terms of the Clark case, which the defense principally relies on, I would note that that case was characterized as extraordinary by the Court in deciding that case. And whereas that case was entirely circumstantial, in this case we have the direct testimony of three officers. This Court should not confuse the lack of corroboration with the finding of insufficiency. If we had a larger bag that had blood on it and was identified to Mr. Smith, that would certainly corroborate the government's case. But the fact that that bag is not in the record doesn't render the jury's verdict based on insufficient evidence. In terms of the sentencing issue, I just want to clarify what I said before a little bit. While we do concede under United States v. Jones, as the opinion stands now, that the robbery, despite the fact that it involved a robbery with a gun in a McDonald's, it does not qualify as a crime of violence under Jones. Nevertheless, Judge Fela sentenced the defendant on an 80-page transcript that gave great weight to the individualized assessment, the 3553 factors, and all of the circumstances of the defendant and his offense that give this Court no reasonable probability that she would do anything different on remand. I find it hard to believe that if the sentencing guideline went down to 84 to 105 months, that the judge wouldn't want to consider that. Is there something in here where she says, no matter what the guideline range is, I'm giving him 120? She doesn't quite say it in those words, but I think the record on the whole makes clear that effectively that's what she would do. In this case in particular, she said that the sentence she was giving, and this is after she had considered the guidelines, said that she was going to give a sentence that fully captures all that is Mr. Smith, the good and the bad of him. She specifically did say that she would do the same thing regardless of whether the career offender guidelines applied, which she found they did not, but she said she would do the same thing regardless of whether they applied. So we have already an indication that the guidelines here, while she considered them as she was required to do and properly did, they were not the primary driver behind her ultimate sentence. Indeed, and this is page 704, after she finished calculating the guidelines, she said to Mr. Smith, Mr. Smith, as I noted to you at the beginning of this proceeding, I needed to make some calculations. I've done that now, but I also now need to decide your sentence. After that, she took a break after hearing arguments from counsel about the 3553 factors. This is after all the guideline issues had been put to bed. And then she explained in pages of the transcript that her ultimate sentence was based on the defendant's family circumstances, his mental health, his employment history, his escalating criminal episodes, including the fact that this sentence, or the sentence that she would impose here, needed to exceed the sentence he had on his prior robbery conviction. And she talked about his domestic issues. And we don't have to just speculate that Judge Fela spent a long time thinking about this sentence. She says on page 707 of the appendix, I've struggled with this sentence, and I have for a long time. In other words, we know that she's given very careful attention to a proper sentence here. That same page, she says, that number does not fully capture. All that is Mr. Smith, the good and the bad of him, again indicating that she took a holistic view in sentencing, and that was the primary motivator here. And then again, page 710, she says, this is for me the appropriate sentence in light of all the factors and all the discussions that we've been having. And I would add to that that even if the guidelines change, the actual facts don't change. In other words, no one is disputing here that the prior drug convictions were for crack dealing. No one disputes that the robbery was in fact an armed robbery and a McDonald's. And so while there are subtle legal questions that have a tremendous impact on the guidelines range here, when it comes to actually sentencing the defendant, Judge Fela made a careful, comprehensive, and individualized assessment. And I would note that to the extent that the sentence was pegged to anything, because it wasn't pegged to the guidelines in any meaningful way, it wasn't a guideline sentence and it wasn't some percentage of the guidelines, it was pegged to the top of the range for count one, which was 120 months, and that stays the same whether this court finds that after Jones the guidelines are different or not. So I don't know that the terms matter, so we're calling this a departure? Sorry? We call this a departure. I think it, if it, yes, we think she would, we think she would, I think it would be a variance, yes. You think it's a variance, not a departure? Does that make any difference? I think if it were to go back, the correct guidelines range would be 84 to 105, and I think she would vary upward. In other words, she would go outside of the guidelines under 3553. On what theory? On the theory that, and I would point out that this is actually a unique situation, because if the defendant were to commit the crime today, I'm asking why would Judge Fela, what's the basis for your saying that if there is a remand and she's faced with this different guidelines that she would depart upward? I think the reason is as follows, because even though the amended guidelines would be 84 to 105, we think that the guidelines here wouldn't capture the true culpability as intended by the guidelines. As this court is aware, the guidelines were amended in August of this year to explicitly add robbery, so there's no more question whether robbery is a crime of violence. So if he were to commit the exact same crime today, his guideline range would be the 140 to 175. Now, it's not, because the guidelines at the time— What's the effect of that guideline on Jones in your view, or what should it be? Well, I think Jones acknowledged that it had a limited effect, because once the guidelines were amended, Jones doesn't matter anymore, because Jones addressed robbery, and now we know that the guidelines think that robbery is a crime of violence. But there's this period of time now where people have been sentenced before August of 2016, but I think in light of the fact that if he were to commit the same crime today, we understand and we can see that the sentencing guidelines thinks that 140 to 175 would be the appropriate range. Aren't you getting close to ex post facto when you do this? Well, that's why I say if he were to commit the same crime today. I have a couple of clerical questions, not directly relevant to the merits. How many—we understand that there are many resentencings that are pending in the district courts, but are you aware of how many there may be in the Southern District of New York in which your office is involved as a result of the decision in Jones? I apologize to the court— No, no, there's no reason why you should, but you have somebody next to you lurking who may have this information. I can certainly confirm. Yes, yes. I'm informed by co-counsel that it is several dozen, although we don't have the exact number. Several dozen. Several dozen. So the issuance of the mandate has some administrative significance. Let me ask you, you are noted as a special assistant. What does that mean in this case? It means that at the time of the trial, although it's no longer true anymore, I was employed by the Department of Justice's Antitrust Division, and I had come in on a temporary basis to work in the U.S. Attorney's Office. And you're now in the USA. And I'm no longer special. Nobody ever—as in academic life, additional descriptive words in your title are not good. Thank you. Thank you. Thank you. Mr. Larson. Your Honors, Mr. Tracer's argument about prejudices foreclosed by Jones and Molina, the latest case from the Supreme Court, which made very clear that when there is a material difference in the guideline range, as there is here, there is plain error and there has to be a remand. And I think Judge Rastani is absolutely correct. This certainly would have influenced Judge Fela if she had known that the low end was not 140 but 84. As far as you know, the government's representation regarding dependency of several dozen resentences is roughly accurate? Certainly there are many Johnson motions. I'm not sure if my friend was talking about Johnson motions or other kind of resentencing motions limited to Jones or based on Johnson generally. There are certainly a lot of them. I don't know—so I guess a lot are pending. You're busy. We're busy, certainly, yes. And if you—and I would note, as I did earlier, that in the Jones cases that have been litigated under Johnson, the government has conceded the Jones issue in all of those cases. So although, yes, Your Honors, completely correct, the mandate has not issued in Jones, and therefore Mr. Jones has yet to be resentenced, the judgment of the court was issued and the government is following it, district courts are following it. It's precedent unless changed. Are you calling Jones cases sentencing guidelines cases? Is that what you mean as opposed to Johnson cases which are statutory? When I say Jones, I mean enhancements that were based on New York robbery convictions. Okay, all right. And Johnson, of course, is a much broader universe than that. Okay. Thanks very much. We'll adjourn this session.